UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EVENS CLAUDE, | : | |
| *Petitioner*, | : | |
| | : | |
| v. | : | Case No. 3:24-cv-961 (KAD) |
| | : | |
| STOVER, | : | |
| *Respondent*. | : | FEBRUARY 3, 2025 |

### <u>MEMORANDUM OF DECISION RE: [7] AMENDED PETITION FOR WRIT OF HABEAS CORPUS; [16] MOTION FOR IMMEDIATE RELEASE</u>

On July 19, 2024, Petitioner Evens Claude ("Petitioner"), a prisoner confined at the Federal Correctional Institution in Danbury, Connecticut ("FCI Danbury"), filed the instant Amended Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. *See* Amended Petition, ECF No. 7. In his Amended Petition, Petitioner challenges a disciplinary finding and associated sanctions, the application of time credits under the First Step Act ("FSA"), and his conditions of confinement. *See id.* In response to the Court's ensuing Order to Show Cause ("OSC"), ECF No. 8, Respondent argues that the Amended Petition should be denied in its entirety. OSC Response, ECF No. 14. Respondent has filed documents supporting the challenged disciplinary finding and further demonstrating the calculation of Petitioner's FSA earned time credits. *See id.* On December 16, 2024, Petitioner filed a Motion for Immediate Release, to which Respondent has objected. *See* ECF Nos. 16, 17. For the reasons set forth below, the Amended Petition is **GRANTED in part** and **DENIED in part**, and the Motion for Immediate Release is **DENIED**.

**Background**

On August 29, 2014, Petitioner was convicted in the United States District Court for the Eastern District of Pennsylvania on charges of conspiracy, bank fraud, access device fraud, aggravated access device fraud, and uttering counterfeit currency. *See* OSC Response, Declaration

of S. Stokes ("Stokes Decl."), Ex. 12, at ¶ 4. Petitioner was sentenced to a term of imprisonment of 232 months followed by five years of supervised release. *Id.* Petitioner's current projected release date, considering both good conduct time ("GCT") and First Step Act time credits, is May 11, 2029. *Id.*

<u>Disciplinary Challenge</u>

On April 12, 2022, a front lobby officer scanning mail at FCI Danbury noticed a package addressed to "Medical dept./Pharmacy," that appeared to contain an electronic device. OSC Response, Declaration of Anthony Amico ("Amico Decl."), Ex. 1, at ¶ 4. Special Investigative Services ("SIS") was notified and reported to the lobby to open the package. *Id.* Inside the package was a box containing Lacri Pure eye solution. *Id.* However, under the vials of eye solution, SIS discovered five cell phones, five cell phone chargers with cables, and two SD card readers. *Id.*

SIS began an investigation, which included interviews with Petitioner and a joint investigation with the United States Postal Service ("USPS"). *See* OSC Response, Investigation Report, Ex. 2; Amico Decl., Ex. 1, at ¶ 5. The subject package was mailed from Philadelphia, Pennsylvania, where Petitioner's family lives,[1] rather than from Massachusetts, where the eye solution is manufactured. Petitioner is the only inmate at FCI Danbury authorized to use this medication. A few weeks before the package arrived, Petitioner told the pharmacist that he would soon need a new order of the medication. The pharmacist told Petitioner that when he picked up the refill, he would receive the whole box of vials to keep as self-carry medication. *Id.*

When staff searched Petitioner's cell, they found an envelope from a woman, Lydia

---

[1] During his initial interview with SIS, when asked whether he had friends or family in Philadelphia, Petitioner stated that his entire family was from Philadelphia. *See* OSC Response, Investigation Report, Ex. 2 at 4. In his reply memorandum, however, Petitioner states that his mother and brother moved to New Jersey long before this incident. *See* ECF No. 15 at 7.

Harris,[2] who was on his contacts list with a return address in Philadelphia. The handwriting on the envelope matched the handwriting on the subject package. *Id.*

SIS staff also listened to about fifteen phone calls from Petitioner to his brother, and obtained translations of the portions of those conversations that were in Haitian Creole. The calls referred to a package and acknowledge that the package had been sent. In another call, Petitioner emphasized that the items in the box should be covered. *Id.*

On June 28, 2022, SIS referred the matter to the FBI for possible prosecution. Until the FBI made a decision, the original Incident Report was not provided to Petitioner. OSC Response, Amico Decl., Ex. 1 at ¶ 6. On September 13, 2022, the FBI declined prosecution. *Id.* The following day, Lieutenant Echandi delivered the original Incident Report to Petitioner and explained his right to remain silent. *Id.* at ¶ 7. Petitioner exercised that right by stating, "no comment." *Id.* Lieutenant Echandi conducted an investigation and concluded that the matter should be referred to the Unit Discipline Committee ("UDC"). *Id.* at ¶ 8. A UDC hearing was held on September 15, 2022, at which time the UDC referred the matter to the Discipline Hearing Officer ("DHO") for a further hearing, based on the severity of the acts involved. *Id.* at ¶ 9.

On September 21, 2022, the Incident Report was rewritten (hereinafter, the "Rewritten Incident Report") to revise one charged offense from Code 297, Phone Abuse High Severity, to Code 197, Phone Abuse Greatest Severity.[3] *Id.* at ¶ 10. The facts in the Rewritten Incident Report were otherwise essentially the same as in the original Incident Report. *Id.* That same day, Lieutenant Echandi gave Petitioner a copy of the Rewritten Incident Report and explained his right

---

[2] Petitioner attaches to his reply memorandum a portion of his presentence report stating that Lydia Harris is the mother of Petitioner's son. *See* ECF No. 15 at 9, ¶ 94.

[3] Given that Petitioner is challenging his Prohibited Act 197 charge—which was first brought in the Rewritten Incident Report—the Court construes the Amended Petition as referring to the Rewritten Incident Report.

to remain silent.  Again, Petitioner confirmed that he understood his right and had "no comment." *Id.* at ¶ 11.  Lieutenant Echandi referred the Rewritten Incident Report to the UDC for a hearing. *Id.* at ¶ 12.

The second UDC hearing was held on September 23, 2022.[4]  *Id.* at ¶ 14.  Petitioner declined to comment and, based on the severity of the act charged, the UDC decided to refer the matter to the DHO.  *Id.*  On September 23, 2022, Petitioner received notice of the disciplinary hearing before the DHO.  *Id.* at ¶ 15.  Petitioner indicated that he wanted a staff representative and that he wanted to call the FCI Danbury pharmacist as a witness to testify that he had emailed Petitioner that his medication was ready for pickup.  *Id.*  The same day, Petitioner was provided written notice of his rights at the disciplinary hearing.  *Id.*

The disciplinary hearing was held by videoconference with DHO Amico on September 29, 2022.  *Id.* at ¶ 16.  Although Petitioner had initially elected a staff representative and witness, he had waived these rights prior to the hearing.  *Id.*; *see also* OSC Response, Notice of Hearing, Ex. 6.  The DHO acknowledged and explained the delay in serving the original Incident Report and scheduling the hearing and determined that this delay did not present any hardship to Petitioner in preparing his defense.  *See* OSC Response, Amico Decl., Ex. 1 at ¶ 16.  Petitioner did not raise any procedural issues at the hearing or present any evidence; he merely denied the charge.  *Id.*

The DHO reviewed the Rewritten Incident Report and investigation, the SIS report, photographs of the contraband, documentation from the Inmate Trust Fund system, memoranda from staff, and the transcripts of the translated phone calls.  *Id.* at ¶ 17.  At the conclusion of the hearing, the DHO found Petitioner guilty of the following Prohibited Acts: (1) 108A (Possession

---

[4]  On September 21, 2022, the Warden approved the UDC's request to hold the hearing more than five days after staff became aware of the Prohibited Act, as the delay was caused by the investigation, the time awaiting the FBI determination, and rewriting the initial Incident Report.  *Id.* at ¶ 13.

of a Hazardous Tool, Attempt); and (2) 197 (Phone Abuse/Disrupting Monitoring – Greatest Severity). *Id.* at ¶ 18. The DHO found Petitioner's denial not credible and found that the phone calls were consistent with the reporting officer's version of events. *Id.*

In connection with Prohibited Act 108A, Petitioner was sanctioned with: (1) a 41-day disallowance of GCT; (2) 60 days of disciplinary segregation; (3) a 375-day loss of non-vested GCT; (4) a six-month loss of visiting privileges; and (5) a six-month loss of commissary privileges. *Id.* at ¶ 19. As for Prohibited Act 197, Petitioner was sanctioned with: (1) a 41-day loss of GCT; (2) 30 days of disciplinary segregation, to be served consecutive to the other sanctions; and (3) a one-year loss of phone privileges. *Id.*

**First Step Act**

Petitioner was sentenced in 2014. On January 2, 2018, the United States District Court for the Eastern District of Pennsylvania ordered the Warden and the U.S. Mashal Service ("USMS") to produce Petitioner for a hearing later that month and to return him to FCI Danbury immediately following the termination of the proceeding. OSC Response, Stokes Decl., Ex. 12, ¶¶ 14–15, 21. However, the court further ordered that Petitioner be present at later hearings. *Id.* at ¶ 23. As such, the USMS retained custody over Petitioner until he was returned to FCI Danbury on October 21, 2021. *Id.* While in USMS custody, Petitioner was housed at the Metropolitan Detention Center in Brooklyn, New York ("MDC Brooklyn") and the Federal Detention Center in Philadelphia, Pennsylvania ("FDC Philadelphia"). *Id.* at ¶ 24.

In late 2019 and early 2020, the Bureau of Prisons ("BOP") conducted risk assessments of all inmates in BOP institutions, regardless of whether the inmates were in BOP or USMS custody. *Id.* at ¶ 27. Petitioner was assessed as having a low risk of recidivism in February 2020 at FDC Philadelphia, and again in April 2021 at FCI Danbury. *See* OSC Response, FSA History, Ex. 18.

He did not have another risk assessment until November 2021.  OSC Response, Stokes Decl., Ex. 12 at ¶ 28.

Petitioner's needs regarding "Trauma and Mental Health" were assessed based on his mental health records prior to his return to FCI Danbury; his other needs were not assessed until after he returned to FCI Danbury in October 2021.  *Id.* at ¶ 29.  Nor did Petitioner have any "Program Reviews" while housed at FDC Philadelphia from January 16, 2018 until October 2021. *Id.* at ¶ 30.  While at FDC Philadelphia, Petitioner was not assigned to any programs.  *Id.*

Once Petitioner returned to FCI Danbury, he began to earn FSA time credits, earning 525 credits for the period from October 21, 2021 through September 5, 2024.  *Id.* at ¶ 24.

**Conditions of Confinement**

In his Amended Petition, Petitioner alleges only that he suffers from "extreme dry eyes," and that his ophthalmologist has recommended that he be housed in a unit without fans.  *See* Amended Petitioner at 9.  In his supporting memorandum, Petitioner adds that he has undergone two corneal transplants and is legally blind in both eyes.  *Id.* at 39.  He is housed in a dormitory with over ten fans in the sleeping area, which worsen his dry eye condition.  *Id.*  Petitioner alleges that he sleeps with his eyes slightly open and "[h]is eyeballs and his eyelids on the morning feel like 2 pieces of rubber rubbing together with no grace."  *Id.*

**Motion for Immediate Release**

During the pendency of his Amended Petition, Petitioner filed a Motion for Immediate Release.  ECF No. 16.  The Motion for Immediate Release asserts arguments largely duplicative of those advanced in the Amended Petition, regarding the calculation of Petitioner's lost good time credit ("GCT") and FSA time credits.  Petitioner contends that if, through the Amended Petition, his GCT is returned to him and he is otherwise awarded the FSA time credits he seeks, then he is

entitled to immediate transfer to prerelease custody.  *See id.*

**Standard of Review**

Section 2241 affords relief only if the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(c)(3).  A petition filed pursuant to Section 2241 may be used to challenge the execution of a prison sentence.  Thus, Section 2241 petitions are appropriately used to challenge conditions of confinement or sentence calculations.  *See Levine v. Apker*, 455 F.3d 71, 78 (2d Cir. 2006).  Execution of a sentence also includes prison disciplinary hearings, so a Section 2241 petition is the proper means to challenge a prison disciplinary hearing.  *Adams v. United States*, 372 F.3d 132, 135 (2d Cir. 2004).

Before filing a habeas petition pursuant to Section 2241, prisoners are required to exhaust internal grievance procedures.  *See Carmona v. United States Bureau of Prisons*, 243 F.3d 629, 634 (2d Cir. 2001).

**Discussion**

<u>Habeas Corpus</u>

The Amended Petition asserts nine grounds for relief.  Grounds One through Seven concern Petitioner's disciplinary proceedings, and argue that: (1) the Rewritten Incident Report is vague as to Prohibited Act 108A; (2) the Rewritten Incident Report does not clearly state the charge as to Prohibited Act 197; (3) there is a lack of supporting evidence connecting Petitioner to the subject "contraband package"; (4) the "some evidence" standard was not met with respect to Prohibited Act 197; (5) the original Incident Report was not timely delivered; (6) the hearing officer was not fair and unbiased; and (7) the sanctions were disproportionate.  Ground Eight challenges BOP and FCI Danbury's failure to award Petitioner with FSA time credits for programs he completed while released on the writ and in USMS custody.  Ground Nine asserts an Eighth Amendment conditions

of confinement claim, based on Petitioner being housed in a unit with fans that exacerbate his dry eye condition.[5]  The Court will address each of these nine grounds in turn.

*Disciplinary Challenge (Grounds One through Seven)*

As to Grounds One through Seven, Petitioner challenges several facets of his disciplinary proceedings, generally citing a lack of due process.  In response, Respondent argues that Petitioner was afforded adequate due process consistent with *Wolff v. McDonnell*; that the "some evidence" standard for prison discipline proceedings was satisfied; and that Petitioner's sanctions were appropriate and not excessive.  *See* 418 U.S. 539 (1974).  Having duly considered each of Petitioner's arguments, the Court agrees with Respondent.

Under the Fourteenth Amendment, federal prisoners are entitled to certain limited due process rights "when disciplinary actions subject them to further liberty deprivations such as loss of good-time credit or special confinement that imposes an atypical hardship."  *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004).  Due process requires that an inmate receives "advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken."  *Id.*  The decision of the hearing officer must be supported by "some evidence." *Superintendent v. Hill*, 472 U.S. 445, 455 (1985) ("The requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board to revoke good time credits."); *see also Levya v. Warden*, 699 F. App'x 4, 5 (2d Cir. 2017) (upholding disciplinary ruling in case involving possession of contraband cell phones where "some evidence" standard

---

[5] Notably, Respondent concedes that Petitioner exhausted his institutional remedies on all claims.  *See* OSC Response at 2.

was satisfied).  This evidence must also be reliable.  *See Sira*, 380 F.3d at 69 (disciplinary finding deemed supported if evidence is reliable); *Taylor v. Rodriguez*, 238 F.3d 188, 194 (2d Cir. 2001) (without determining reliability of the evidence, court is left to speculate whether disciplinary decision is supported by some evidence).

<u>Vague Incident Report</u>

Ground One and Ground Two assert that the Rewritten Incident Report was vague and otherwise failed to clearly state Petitioner's charges as to Prohibited Act 108A and Prohibited Act 197.  The Court is not persuaded.[6]

As to his Prohibited Act 108A charge, Petitioner contends that the Rewritten Incident Report lacks clarity as to whether he was charged with possession or attempted possession, and further emphasizes that the Regional Office affirmed a possession charge while the Central Office affirmed an attempted possession charge.  *See* Amended Petition at 6–7.  Petitioner also contends that there is no language for attempt in Prohibited Act 108.  *See id.*  The Prohibited Acts are set forth in Table 1 in 28 C.F.R. § 541.3.  For each act, "[a]iding, attempting, abetting, or making plans to commit any of the prohibited acts is treated the same as committing the act itself."  28 C.F.R. § 541.3(a).  An "A" notation may be combined with the offense code to indicate an attempt charge.  *See* Program Statement 5270.09, https://www.bop.gov/policy/progstat/5270_009.pdf at 10 (last visited Jan. 31, 2025).  Clearly, Petitioner was aware that he did not complete the Prohibited Act—and instead merely attempted to do so—because he never obtained the phones and other items hidden in the package.  Moreover, the Rewritten Incident Report does not state that the Prohibited Act was completed.  Insofar as an "attempt" is treated the same as a completed

---

[6]  The Court is likewise unpersuaded by Petitioner's assertion that the Rewritten Incident Report failed to specify which of the items found by the SIS team was the subject of the Report.  Indeed, a plain reading of the Rewritten Incident Report charges Petitioner with attempting to introduce into the facility <u>all</u> of the items in the box, not one specific item.

act, the Court concludes that the Rewritten Incident Report was not vague as to Prohibited Act 108A.

As to Ground Two, Petitioner further argues that the Rewritten Incident Report did not state the Prohibited Act 197 charge with sufficient clarity insofar as it did not specify any criminal activity in the subject phone conversations. Amended Petition at 7. Petitioner's argument misses the mark. Prohibited Act 197 forbids "[u]se of the telephone for an illegal purpose or to commit or further a Greatest category prohibited act." 28 C.F.R. § 541.3(a) (Table 1). It does not require that the activity in furtherance of a Prohibited Act (*i.e.*, the phone calls) be criminal in and of itself. Moreover, the Rewritten Incident Report expressly refers to statements made in furtherance of the Prohibited Act of sending the illicit package to the facility. *See* OSC Response, Investigation Report, Ex. 2 at 7–8; Rewritten Incident Report, Ex. 5 at 2.

For the foregoing reasons, the Court cannot conclude that the Rewritten Incident Report was vague and/or otherwise failed to clearly state Petitioner's charges. As such, Ground One and Ground Two are **DENIED**.

<u>Supporting Evidence</u>

In Ground Three, Petitioner argues that there was a lack of evidence supporting his charge for Prohibited Act 108. Once again, the Court is not convinced. The DHO found that Petitioner was the only inmate at FCI Danbury authorized to use the medication contained in the package. Shortly before the package was delivered, Petitioner informed the pharmacist that he would soon require a refill of his prescription, and further verified with the pharmacist that when he requested the refill, he would be given the entire box of medication to keep for his use. Ultimately, the medication was not sent from its place of manufacture, but rather, from Philadelphia, where Petitioner had contacts. *See* OSC Response, Photographs, Ex. 9 at 18–19. In addition, photographs

of the box show that it was not affixed with a professional-looking label, *i.e.*, one that might have been generated by the manufacturer of his medication, as opposed to a private citizen. *See id.* at 3, 14. Although Petitioner denied any knowledge of the package, the Court concludes that the DHO had more than "some evidence" supporting the charge.

In Ground Four, Petitioner contends that the DHO failed to meet the "some evidence" standard on the Prohibited Act 197 charge, because the subject telephone calls did not involve criminal activity. As indicated above, Prohibited Act 197 prohibits "[u]se of the telephone for an illegal purpose *or* to commit or further a Greatest category prohibited act." 28 C.F.R. § 541.3(a) (Table 1) (emphasis added). Thus, the calls themselves did not need to involve criminal activity in order to further a Prohibited Act. For example, the DHO found that, in the phone conversations, Petitioner had emphasized that the items—later concluded to be the illicit phones, chargers, and SD readers—needed to be covered in the medication box. *See* OSC Response, Translated Phone Calls, Ex. 11 at 33. Although Petitioner challenges the accuracy of the transcription of the phone calls, he identifies no discrepancies relating to the preparation and mailing of the package. As such, the Court is satisfied that the translation constitutes "some evidence" to support the charge. Indeed, it is not the Court's function to reweigh the evidence presented before the DHO. Rather, the Court must determine only whether "there is any evidence in the record that could support" the DHO's conclusion. *Hill*, 472 U.S. at 455–56.

Accordingly, Ground Three and Ground Four are **DENIED**.

<u>Delivery of Incident Report</u>

Ground Five argues that the Incident Report was not timely delivered to Petitioner.[7]

---

[7] While it is not abundantly clear to which Incident Report Petitioner refers in Ground Five, for the reasons set forth *infra*, the Court is satisfied that delivery of both the original Incident Report and the Rewritten Incident Report was compliant with the relevant due process standard.

Petitioner is incorrect. An incident report is ordinarily delivered within twenty-four hours after staff becomes aware of the inmate's involvement in an incident. *See* 28 C.F.R. § 541.5(a); Program Statement 5270.09 at 17. "Courts have consistently held, however, that this regulation, by its terms is not mandatory, and, in any event, does not create an enforceable right." *Roberts v. Warden, FCI Berlin*, No. 20-CV-618 (SE), 2022 WL 1205515, at *4 (D.N.H. Mar. 23, 2022) (internal quotation marks and citation omitted), *report and recommendation approved*, 2022 WL 1205205 (D.N.H. Apr. 22, 2022). Indeed, the Supreme Court has determined that due process requires written notice of the charges to be received at least twenty-four hours before any hearing. *See Wolff*, 418 U.S. at 555–56; *see, e.g.*, *Walker v. Williams*, No. 3:16-CV-1048 (JAM), 2018 WL 264172, at *3 (D. Conn. Jan. 2, 2018) (finding no due process violation where inmate received incident report more than two weeks before DHO hearing, well beyond the 24-hour notice required under *Wolff*). Further, the Program Statement provides that "[i]f an incident is referred for prosecution, the report is delivered by the end of the next business day after release for administrative processing." Program Statement 5270.09 at 19.

Here, it was not immediately apparent that Petitioner was involved in the incident, as the subject package was not addressed to him. Rather, his connection to the package was discovered through the ensuing SIS investigation. Thereafter, the matter was referred for prosecution. In compliance with the Program Statement, the original Incident Report was delivered the day after FBI's decision not to prosecute.[8] The ensuing Rewritten Incident Report was delivered to Petitioner on the same day it was issued. Accordingly, the Amended Petition is **DENIED** as to the Ground Five.

---

[8] The Court further observes that Petitioner has consistently denied any knowledge of the package, and does not argue that the delay in delivery of the Incident Report prejudiced his ability to prepare a defense.

<u>Fair and Unbiased Hearing Officer</u>

In Ground Six, Petitioner contends that his hearing officer was not fair and unbiased. Specifically, Petitioner asserts that the DHO did not permit him to present a defense and documents.  However, Petitioner does not identify any documents that he intended to present at his hearing, and in general, his defense of the charge was a straightforward denial that he knew anything about the package.  The DHO considered Petitioner's denial, as well as evidence supporting Petitioner's involvement in the incident, including statements of the officers involved and the results of the SIS investigation.  That the DHO did not credit Petitioner's denial does not alone demonstrate that the hearing officer was not fair and unbiased.  *See Stroud v. Warden Stover*, No. 3:23-CV-1687 (SVN), 2024 WL 4513070, at *9 (D. Conn. Oct. 17, 2024) ("Court does not question the DHO's credibility assessment or weighing of the evidence presented").  Accordingly, Ground Six is **DENIED**.[9]

<u>Disproportionate Sanctions</u>

Finally, through Ground Seven, Petitioner contends that his sanctions were disproportionate and violated the Eighth Amendment.  Petitioner principally argues that although most inmates who possess a cell phone are sanctioned with a loss of 41 days of GTC, Petitioner was unfairly sanctioned with disallowance of fifteen months of GTC.

The BOP has established a list of Prohibited Acts which are divided into four categories, based on severity.  *See* 28 C.F.R. § 541.3 Table 1.  The two Prohibited Acts with which Petitioner was charged are both of the "greatest severity."  *See id*. at Table 1.  Available sanctions for a "greatest severity" Prohibited Act include "[f]orfeit and/or withhold earned statutory good time or

---

[9] Ground Six further alleges that while writing down the sanctions, the DHO stated, "the more you speak the more I write."  *See* Amended Petition at 8.  The Court has considered these allegations *infra*, in conjunction with Ground Seven.

non-vested good conduct time (up to 100%) and/or terminate or disallow extra good time"; "[d]isallow ordinarily between 50% and 75% (27-41 days) of good conduct time credit available for year"; "[f]orfeit up to 41 days of earned First Step Act (FSA) Time Credits . . . for each prohibited act committed"; [d]isciplinary segregation (up to 12 months)"; and "[l]oss of privileges (e.g. visiting, telephone, commissary, movies, recreation)." *See id.*

In *Hernandez v. Lindsay*, the petitioner challenged his disciplinary sanctions as violating his rights under the Eighth Amendment and the Due Process Clause. No. 08-CV-10495 (SJF), 2011 WL 3163078 (E.D.N.Y. July 22, 2011). There, the court rejected both claims, explaining that the sanctions, which were expressly authorized under the regulation, were "not atypical" and, thus, did not violate due process. *See id.* In addition, the court explained that the sanctions were "reasonably calculated to restore prison discipline and security," and "served a clear penological justification, *i.e.*, the effective quelling of this type of behavior." *Id.* at *6 (citing *Trammell v. Keane*, 338 F.3d 155, 164 (2d Cir. 2003)). The court dismissed the Eighth Amendment claim because the petitioner had not shown "that the sanctions were imposed by the DHO in deliberate indifference to his health or safety, or were objectively serious[.]" *Id.*

Albeit more commonly raised in the context of a due process challenge, other courts agree that sanctions which fall within the statutorily permissible range are not unconstitutional. *See, e.g.*, *Wentzel v. Pliler*, No. 21-CV-9245 (AT), 2022 WL 9798257, at *11 (S.D.N.Y. Oct. 17, 2022) (declining to second guess sanctions imposed by DHO where sanctions were within the range of penalties available for the offense); *Wallace v. Ebbert*, 505 F. App'x 124, 125 (3d Cir. 2012) (*per curiam*) (petitioner's "loss of 458 days of non-vested good conduct time was clearly permitted by this regulation, and, although the loss of 54 days of good conduct time exceeded the 'ordinary'

14

sanction, nothing in Table 1 prohibited the DHO from disallowing a greater percentage of his good conduct time in an effort to deter him from future infractions . . .") (internal alterations omitted).

Here, in connection with Prohibited Act 108A, Petitioner was sanctioned with 41-days' disallowance of GTC, 60 days of disciplinary segregation, 375-days' loss of non-vested GTC, a six-month loss of visiting privileges, and a six-month loss of commissary privileges. *See* OSC Response, Amico Decl., Ex. 1 at ¶ 19. For Prohibited Act 197, Petitioner was sanctioned with 41-days' loss of GTC, 30 days of disciplinary segregation to be served consecutive to the other sanctions, and a one-year loss of phone privileges. *Id.* Petitioner's sanctions fell within the range of permissible sanctions set forth in Table 1. In addition, the DHO stated:

> The action/behavior on the part of any inmate to possess a hazardous tool (e.g. hacksaw blade, body armor, maps, handmade rope, or other escape paraphernalia, portable telephone, pager, electronic device or tool that can cause a hazardous situation) in any correctional institution seriously jeopardizes the security of the institution and poses a threat to the ability of staff to provide for the safety and security for staff, inmates and the general public as a whole. The sanctions imposed by the DHO were taken to let the inmate know that he, and he alone, will be held responsible for his actions/behaviors at all times.

> The action/behavior on the part of any inmate to use the telephone for an illegal purpose or to commit another greatest severity prohibited act disrupts the security and orderly operation of the institution. This action demonstrates you have the inability to use the telephone in a highly responsible manner as well. When used properly as intended by the Bureau of Prisons, the use of the telephone allow inmates the opportunity to maintain relationships with family and the community. This type of action/behavior cannot and will not be tolerated from any inmate.

OSC Response, DHO Report, Ex. 9 at 5.

As the sanctions imposed were within the permitted range and were not imposed in deliberate indifference to Petitioner's health or safety, his Eighth Amendment challenge fails. *See Del Toro v. Ortiz*, No. 20-CV-1977, 2022 WL 787948, at *7 (D.N.J. Mar. 15, 2022) ("It is not the duty of this Court, however, to determine whether the DHO issued the most appropriate sanction

under the circumstances.  Rather, this Court need only determine whether the sanction violated the 'Constitution or laws or treaties of the United States.'") (quoting 28 U.S.C. § 2241(c)(3)).

Petitioner refers the Court to *Jimenez v. Stover*, and emphasizes that Jimenez was found guilty of possessing a cell phone and was sanctioned by the same DHO to loss of only 41 days of GCT.  *See* No. 3:23-CV-1126 (OAW), 2024 WL 1344674 (D. Conn. Mar. 29, 2024).  But the facts of the Jimenez are not identical to those presented here.  Indeed, Jimenez was found guilty of possessing one cell phone in his cell.  *Id.* at *1.  By contrast, Petitioner was found guilty of attempting to bring five cell phones and two SD card readers into the facility, a more serious situation.  Thus, as Petitioner has not identified a similar circumstance where the prisoner received significantly lesser sanctions, his claim that his sanctions were disproportionate, and that the DHO was not fair and unbiased in imposing these sanctions, are without merit.  Ground Seven is **DENIED**.

### *First Step Act (Ground Eight)*

Ground Eight asserts that Petitioner should receive FSA time credits for the programs he completed while released on a writ and held in USMS custody.  Respondent argues that under the applicable regulations, Petitioner was not successfully participating in FSA-eligible programming while on the writ, and is therefore not entitled to the FSA credits he seeks.  Here, the Court agrees with Petitioner in part.

On December 21, 2018, Congress enacted the First Step Act ("FSA"), which was intended to encourage federal inmates to participate in evidence-based recidivism reduction programs ("EBRRs") and other productive activities ("PAs").  Inmates earn time credits upon successful participation in these activities, and the time credits qualify the inmates for early release from custody.  *See* 18 U.S.C. §§ 3632(d)(4)(C), 3624(g)(1)(A).  Application of the time credits will

enable an inmate to be transferred sooner to prerelease custody, either in a residential reentry center, on home confinement, or supervised release. *See* 18 U.S.C. § 3624(g).

Eligible inmates assessed as minimum or low risk of recidivism earn 10 days of time credits for every 30 days of successful participation in the programs. 18 U.S.C. § 3632(d)(4)(A)(i). If an eligible inmate is determined to be a minimum or low risk of recidivism for two consecutive assessments, that inmate is eligible to earn 15 days of time credits for every 30 days of successful participation in the programs. 18 U.S.C. § 3632(d)(4)(A)(ii). Although an inmate accumulates FSA time credits each month, he is only eligible to have those credits applied to his sentence when he has "earned time credits under the risk and needs assessment system . . . in an amount that is equal to the remainder of the prisoner's imposed term of imprisonment." 18 U.S.C. § 3624(g)(1)(A); *see also Pujols v. Stover*, No. 3:23-CV-564 (SVN), 2023 WL 4551423, at *2 (D. Conn. July 14, 2023) (collecting cases).

Petitioner asks the Court to order that he be credited with 1,035 days of FSA time credits, which he claims were earned for successfully participating in a recommended EBRR program while confined at FDC Philadelphia under a writ to the USMS. Petitioner argues that Section 3624(g) does not show clear congressional intent that credit shall be given only for programs completed after an inmate's risk and needs assessment and assigned by BOP, and that Section 3632(d) does not require that credit be given only for programs assigned under Section 3632(d)(4)(A).

This Court has previously addressed the same assertion in *Levine v. Stover*. *See* No. 3:23-CV-1092 (KAD), 2024 WL 1435594, at *3 (D. Conn. Apr. 3, 2024). In that case, the petitioner sought FSA time credits for programs he completed during the fourteen months he was in the custody of the USMS on a writ of habeas corpus *ad prosequendum*. The Court dismissed the

petition, relying on an earlier determination that "[a]n inmate may earn time credits only for completing programs to which he has been specifically assigned based on his particular recidivism risk." *Id*. (citation and internal quotation marks omitted).  In denying the petitioner's ensuing motion for reconsideration, the Court relied on the fact that the FSA required the BOP to develop a risk and needs assessment system and provided that, under the system, the BOP "shall": (a) determine the recidivism risk of each inmate; (b) determine the type and amount of EBRR programming appropriate for each inmate; (c) assign the inmate to that programming; (d) periodically, at least once a year, reassess the recidivism risk of each inmate; and (e) based on the reassessment, reassign the inmate to appropriate EBRRs and PAs.  18 U.S.C. §§ 3632(a)(1)-(5), (b)(1), (d)(5).  The Court further observed that other courts had held that the regulation precluding inmates released on writs from earning FSA time credits was a reasonable interpretation of the statute under *Chevron USA, Inc. v. National Res. Def. Council, Inc*., 467 U.S. 837, 865 (1984), and was therefore entitled to deference.

Since this Court's decision in *Levine*, two developments have given this Court pause.  First, the Supreme Court has overruled *Chevron*.  As such, agency regulations are no longer entitled to deference.  Instead, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority . . ." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412 (2024).  Second, in two other cases concerning this issue, the BOP has conceded that it permits inmates to earn FSA time credits for programming that was not specifically assigned to them or was completed before the risk and needs assessment was performed.  *See Mohammed v. Stover*, No. 3:23-CV-757 (SVN), 2024 WL 1769307 at *4 (D. Conn. Apr. 23, 2024) (noting that BOP permits inmates to begin earning FSA time credits immediately upon arrival at designated facility even if risk and needs assessment has not been completed); *Perevoznikov v. Stover*, No.

3:23-CV-767 (OAW), 2024 WL 5265287, at *4 (D. Conn. Aug. 8, 2024) (Respondent conceded that BOP permitted inmates to earn FSA time credits for completing programming that was not assigned to them provided they also enrolled in assigned programming).

Based on these submissions, it appears that BOP does not consider Section 3632 as creating an absolute requirement that FSA time credits may only be awarded after the risk and needs assessment has been completed and only for programs specifically assigned to an inmate based on that assessment. Consequently, the Court will no longer endorse such a rigid interpretation of the statute.

Petitioner was released on the writ before the FSA became effective. He alleges that his initial risk assessment was completed in February 2020 while he was held at FDC Philadelphia, that his trauma and mental health needs were assessed based on his mental health records prior to his return to FCI Danbury, and his other needs were assessed after he returned to FCI Danbury. Although he participated in programming, he was not assigned to any programs while he was at FDC Philadelphia. Respondent attempts to distinguish this case from *Mohammed*, arguing that the issue there concerned programs taken before the petitioner arrived at her designated facility, while Petitioner was released on a writ. However, insofar as the FSA became effective while Petitioner was at FDC Philadelphia, his situation is similar to that in *Mohammed*, because he completed programs while in USMS custody before his risk and needs assessment was completed by his designated facility. In fact, Petitioner alleges that a portion of his risk and needs assessment had been completed while he was in USMS custody, whereas none of Mohammed's risk and needs assessment had been completed when she attended the programs at issue.

Petitioner also alleges that he was kept at FDC Philadelphia for over two years after he attended his last court hearing in Pennsylvania. *See* Petitioner Reply, ECF No. 15 at 4. During

that time, he was housed at a BOP facility and allegedly attended programs. In *Pelullo v. FCC Coleman-Low*, the petitioner was disallowed FTC time credits for programs completed while housed at another BOP facility on a USMS writ. No. 23-CV-189 (WFJ), 2024 WL 3771691 (M.D. Fla. Aug. 13, 2024). However, on review, the court noted that it was not "persuaded that Petitioner could not successfully participate in programming merely because he was outside of his designated facility," and directed BOP to make an individualized determination concerning petitioner's participation in programs outside of his designated facility. *Id*. at *5. The circumstances presented here are similar, in that the Court is unable to determine on the current record whether Petitioner should receive FSA time credits for any of the programs he completed at FDC Philadelphia.[10]

Accordingly, Ground Eight is **GRANTED in part**. **Respondent is directed to review the programs Petitioner attended at FDC Philadelphia in light of the concessions noted above, to determine whether Petitioner should be awarded FSA time credits for his completion of any of those programs, and to award those credits as may be appropriate.**

*Conditions of Confinement (Ground Nine)*

In Ground Nine, Petitioner contends that his conditions of confinement at FCI Danbury exacerbate his "Extreme Dry Eyes" condition, in violation of his rights under the Eighth Amendment. Petitioner seeks relief in the form of an order that he be placed on home confinement, or that he be housed in units "M-A" or "A-A." *See* Amended Petition at 10.

The Prison Litigation Reform Act ("PLRA") restricts the types of relief that federal courts may award in "any civil action with respect to prison conditions." 18 U.S.C. § 3626(a). Thus, the PLRA's requirements and limitations will apply to this claim as it challenges "prison conditions,"

---

[10] Respondent argues that only one of the courses Petitioner took at FDC Philadelphia would eventually qualify as an approved EBRR/PA course. But Respondent does not acknowledge the concessions noted above, *i.e.*, that BOP has granted credit for non-approved courses in certain circumstances. *See Perevoznikov*, 2024 WL 5265287 at *4.

and not "the fact or duration of confinement in prison." *Dimartino v. Sage*, No. 3:21-CV-498 (KAD), 2022 WL 124308, at *4 (D. Conn. Jan. 13, 2022) (quoting *Martinez-Brooks v. Easter*, 459 F. Supp. 3d 411, 433–35 (D. Conn. 2020)). In *Dimartino*, this Court held that the requirements and limitations of the PLRA applied to the petitioners' Section 2241 petition challenging their conditions of confinement, which, as here, included a claim for deliberate indifference to medical needs. *See* 2022 WL 124308 at **3–6. Specifically, the Court noted that petitioners' deliberate indifference claim was made "in a fashion very similar to a civil rights claim brought pursuant to 42 U.S.C. § 1983," *id*. at *5, and explained that the conditions complained of did "not inhere to the fact of [the petitioners'] confinement," but instead related to their conditions of confinement, "because the concerns raised can be remedied through appropriate injunctive relief," such as an order "to provide appropriate medical care, on both an individual and systemic basis." *Id.*

Deliberate indifference to a sentenced prisoner's serious medical needs constitutes cruel and unusual punishment in violation of the Eighth Amendment. *See Spavone v. New York State Dep't of Corr. Servs*., 719 F.3d 127, 138 (2d Cir. 2013) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). To prevail on a deliberate indifference claim, Petitioner must present evidence of sufficiently harmful acts or omissions by a prison official. *See Estelle*, 429 U.S. at 104–06. The prison official must have intended to deny or unreasonably delay access to necessary medical care, or to wantonly inflict unnecessary pain. *See id.* However, "not every lapse in prison medical care will rise to the level of a constitutional violation; rather, the conduct complained of must shock the conscience or constitute a barbarous act." *Daniels v. Murphy*, No. 3:11-CV-286 (SRU), 2014 WL 3547235, at *8 (D. Conn. July 17, 2014) (citation and alterations omitted).

To state a claim for deliberate indifference to a serious medical need, Petitioner must satisfy both objective and subjective components. *See Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir.

1994), *cert. denied sub nom. Foote v. Hathaway*, 513 U.S. 1154 (1995).  To meet the objective component, the prisoner "must show that he actually did not receive adequate care and that the inadequacy in medical care was sufficiently serious." *Valdiviezo v. Boyer*, 752 F. App'x 29, 32 (2d Cir. 2018) (summary order).  When determining whether a medical need is sufficiently serious, the Court considers factors including whether "a reasonable doctor or patient would find [the condition] important and worthy of comment"; whether the condition "significantly affects an individual's daily activities"; and whether the condition causes "chronic and substantial pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citations omitted).  If the Court determines that the prisoner was deprived of medical care, it must "examine how the offending conduct is inadequate and what harm, if any, the inadequacy caused or will likely cause the prisoner." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citation omitted).  If the prisoner was completely deprived of medical care, the courts "examine whether [his or her] medical condition is sufficiently serious." *Id*. (citation omitted).  Where, as here, however, the prisoner received medical treatment but complains that it was somehow inadequate, the seriousness inquiry is narrower.  *Id*.  The Court must determine "whether the inadequacy in the medical care is sufficiently serious." *Thompson v. Recette*, 519 F. App'x 32, 34 (2d Cir. 2013) (summary order).

Under the subjective prong of the deliberate indifference test, a prison official must have been actually aware that his or her actions or inactions would cause a substantial risk of harm to the inmate.  *See Salahuddin*, 467 F.3d at 279–80 (citation omitted).  "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Id*. at 280.  Recklessness requires more than merely negligent conduct.  "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim," and that

"negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim." *Chance*, 143 F.3d at 703. Medical malpractice "may rise to the level of deliberate indifference when it involves culpable recklessness, *i.e.*, an act or failure to act that evinces a conscious disregard of a substantial risk of serious harm." *Charles v. Orange Cnty.*, 925 F.3d 73, 87 (2d Cir. 2019).

Here, Petitioner alleges that he suffers from "Extreme Dry Eyes," for which he has been prescribed eye drops. Thus, Petitioner has not been denied treatment. Instead, Petitioner contends that the fans in his housing unit exacerbate his condition while he sleeps, causing him to experience painful irritation when he wakes. Petitioner seeks release or a transfer to one of two specific housing units within FCI Danbury. As an initial matter, the Court is not persuaded that Petitioner's condition constitutes a sufficiently serious medical need, much less that the purported inadequacy of his medical care was sufficiently serious. *See Brock v. Wright*, 315 F.3d 158, 162–63 (2d Cir. 2003) ("sufficiently serious" deprivation can exist if the detainee suffers from an urgent medical condition that can cause death, degeneration, or extreme or chronic pain). But even if Petitioner's "Extreme Dry Eyes" were considered a serious medical need, Petitioner fails to meet the subjective component of the deliberate indifference test.

Although Petitioner submits copies of records from emergency room visits, those visits concerned refills of his prescription for eye drops, not the condition he complains of here.[11] *See* ECF No. 1 at 55–57, 60–64. Indeed, the only evidence relevant to the claim here are the consultation notes from the ophthalmologist who saw Petitioner on July 3, 2023, which include a recommendation that Petitioner be "moved to quarters without fans to help support his eye health."

---

[11] Although Petitioner refers to exhibits in his supporting memorandum, he attaches no exhibits to his Amended Petition. As such, the Court assumes that Petitioner is referring to exhibits attached to his original Petition, which it will consider herein in light of Petitioner's status as a *pro se* litigant. *See* ECF No. 1.

*Id.* at 49–52.  But the ophthalmologist made a recommendation; she did not issue an order.  And as noted by OGC in its corresponding response to Petitioner's administrative remedy, the recommendations of an outside specialist are not binding on the BOP.  *See Rahman v. Artuz*, No. 95-CV-272 (MCG), 1999 WL 600520, at *2 (S.D.N.Y. Aug. 10. 1999).  Moreover, here, prison officials and medical providers concluded—following consultation with Petitioner's optometrist— that there was a viable alternative that would address the ophthalmologist's concerns without requiring a housing transfer.[12]  *See* ECF No. 1 at 66.  That the prison medical providers chose this alternative demonstrates, at most, a disagreement over treatment, which is not cognizable as an Eighth Amendment violation.  *See Collins v. Figura*, No. 3:19-CV-1689 (RMS), 2023 WL 118495, at *12 (D. Conn. Jan. 6, 2023) (no Eighth Amendment claim is stated where prison doctor "disagrees with the professional judgment of another doctor") (citation omitted), *aff'd*, No. 23-109, 2024 WL 1739084 (2d Cir. Apr. 23, 2024).  Ground Nine is **DENIED**.[13]

    <u>Motion for Immediate Release</u>

    Petitioner additionally seeks immediate release consistent with this Court's decision in *Hurley v. Stover*, No. 3:24-CV-593 (KAD), 2024 WL 2274075 (D. Conn. May 20, 2024).  Petitioner principally contends that, as was the case in *Hurley*, he is entitled to enlargement as a provisional remedy, pending adjudication of the instant Amended Petition.  The Court is not

---

[12] Based on the parties' submissions, it is not clear what precisely this "alternative option" entails, and how it might adequately address Petitioner's concerns.

[13] Insofar as Petitioner seeks injunctive relief in connection with Ground Nine, the Court is not persuaded that such relief is warranted. The PLRA requires that prospective relief be "narrowly drawn, extend[] no further than necessary to correct the violation of the Federal right, and [be] the least intrusive means necessary to correct the violation of the Federal right."  *Castelle v. Pullen*, No. 3:22-CV-297 (KAD), 2022 WL 4448898, at *5 (D. Conn. Sept. 23, 2022) (quoting 18 U.S.C. § 3626(a)(1)(A) and applying PLRA requirements to Section 2241 action).  Even if Petitioner were to prevail on his Eighth Amendment claim, he would be entitled to, at most, an order that FCI Danbury provide him appropriate medical care, which would not necessarily align with the relief recommended by his consultative ophthalmologist.  And he certainly would not be entitled to release from custody.  *See id.* at *6 (citing *Reynolds v. Petrucci*, No. 20-CV-3523 (LLS), 2020 WL 4431997, at *2 (S.D.N.Y. July 29, 2020)).  Accordingly, Petitioner's request for injunctive relief on this Ground is denied.

persuaded.

To be sure, a federal court may grant enlargement or bail as a provisional remedy in habeas cases, pending adjudication of a petitioner's claims. *See id.* at *1 (citing *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001). Enlargement is appropriate, however, "only in unusual cases, or when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective." *Mapp*, 241 F.3d at 221. Petitioner must demonstrate that the habeas petition raises substantial claims and that extraordinary circumstances exist. *Id.* In *Hurley*, this Court determined that the petitioner's substantial claim, coupled with the respondent's concerning "evolving narrative as to [p]etitioner's eligibility for FSA credits," met *Mapp*'s exacting "extraordinary circumstances" standard. 2024 WL 2274075 at *1. There, this Court concluded that "immediate enlargement is therefore necessary 'to make the habeas remedy effective.'" *Id.* at *2 (quoting *Mapp*, 241 F.3d at 226).

Petitioner argues that the restoration of approximately fifteen months of GCT lost through his disciplinary proceeding, as well as the application of 1,035 days of FSA time credits—both sought through his Amended Petition—entitle Petitioner to immediate release. Not so. The Court has herein rejected Grounds One through Seven, which seek relief in connection with Petitioner's disciplinary finding and loss of GCT. As such, Petitioner's fifteen months of lost GCT will not be restored. Moreover, in connection with Ground Eight, the Court has determined only that, on the current record, it is unclear whether Petitioner should receive FSA time credits for any of the programs he completed at FDC Philadelphia. To that end, the Court has directed Respondent to review the programs Petitioner attended at FDC Philadelphia to determine whether Petitioner should be awarded corresponding FSA time credits. At this juncture, the Court cannot find that Petitioner's circumstances are sufficiently extraordinary. *See Mapp*, 241 F.3d at 221.

Accordingly, the Motion for Immediate Release is **DENIED**.

**Conclusion**

For all of the foregoing reasons, the Amended Petition for writ of habeas corpus is **GRANTED in part** and **DENIED in part**. The Amended Petition is granted only to the extent that Respondent is directed to review the programs Petitioner attended at FDC Philadelphia to determine whether Petitioner should be awarded FSA time credits for his completion of any of those programs, and to award those credits as may be appropriate. The Amended Petition is denied in all other respects. Additionally, Petitioner's Motion for Immediate Release is **DENIED**. The Court further certifies that any appeal from this judgment would not be taken in good faith.

**SO ORDERED** this 3rd day of February 2025 at Bridgeport, Connecticut.

 */s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE